**FIRST DIVISION**
**PHIPPS, C. J.,**
**ELLINGTON, P. J., and BRANCH, J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**March 20, 2014**

# In the Court of Appeals of Georgia

A13A1893. MCLEOD v. CLEMENTS.

BRANCH, Judge.

R. Jerry McLeod appeals the grant of partial summary judgment in favor of Stan Clements in this long-standing dispute concerning McLeod's claim that he is entitled, at no cost, to water from a well located on Clements's property. We affirm.

Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. OCGA § 9-11-56 (c). We review a grant or denial of summary judgment de novo and construe the evidence in the light most favorable to the nonmovant. *Home Builders Assn. of Savannah v. Chatham County*, 276 Ga. 243, 245 (1) (577 SE2d 564) (2003). The case has a long procedural history, most of which is set forth in the most recent of four previous appeals. See *McLeod v. Clements*, 310 Ga. App. 235 (712 SE2d 627) (2011).

For the purposes of this appeal, the relevant facts concern two "water agreements" between neighboring property owners and a dispute about the effect of a lengthy delay in recording the first of these agreements.

Construed in favor of Jerry McLeod, the record shows that McLeod is the successor in interest of property previously owned by H. E. McLeod, Sr., and that Clements is the successor in interest of property previously owned by H. E. McLeod, Jr.; a well is located on this latter property (the "well property"). McLeod, Sr. originally owned both properties, but at some point, McLeod Sr. transferred the well property to McLeod, Jr., with an agreement that a well, designed to supply water to both properties, would be drilled on the transferred property. McLeod Sr. paid for the installation of the pipes from the well to his property. On September 29, 1971, some time after the transfer, McLeod Jr., entered into a written agreement whereby he granted to Mr. and Mrs. McLeod, Sr., Mike McLeod, and Jerry McLeod the right to maintain the water line and the right to water from the well "free from all charges" while any of the grantees lived on the property:

> [H. E. McLeod, Jr.] . . . does hereby give and grant unto [the grantees] the right to maintain a water line at its present location from the well on the land of [H. E. McLeod, Jr.] to the edge of the property of [H. E. McLeod, Jr.] and to use water from said well free from all charges. This

2

right shall first be in Mr. and Mrs. H. E. McLeod, Sr. jointly for and during their joint lives and then to the survivor and then to Mike and Jerry McLeod, or the survivor of them as long as they live on the property now occupied by Mr. & Mrs. H. E. McLeod, Sr. as a home.

(the "1971 water agreement"). This agreement was not recorded until sometime in 1996. The pipes and water line connection have been visible at the well site and marked by a post since 1971.

Meanwhile, apparently in 1992, McLeod, Jr., transferred the well property to Michael and Sally McLeod[1] who, in turn, transferred it to Ryan and Melissa Reeves on August 28, 1996. The Reeves warranty deed, which was recorded on September 27, 1996, contains a "Special Agreement" in which the Reeves agreed to provide water to McLeod but that McLeod was required to pay electricity and maintenance costs:

> The Buyers by the acceptance of this deed agree to furnish water to the house occupied by Jerry McLeod and Mrs. H. E. McLeod, Sr., for as long as Jerry McLeod and Mrs. H. E. McLeod, Sr., occupy the house adjoining the property herein described, provided Jerry McLeod and Mrs. H. E. McLeod, Sr., pay the [Reeves] a reasonable monthly fee for electricity and any well maintenance cost that are necessary to maintain the well in operating condition.

---

[1] The deed for the 1992 transaction is not in the record.

3

(the "1996 water agreement").[2] The Reeves deed does not reference the 1971 water agreement. Finally, McLeod admits that the 1971 water agreement was recorded while the Reeves had title to the property.

The well property changed hands several times thereafter, and, on August 9, 2007, Clements purchased it pursuant to a "Special Warranty Deed." This deed provided in part that it was "subject to that certain Special Agreement executed in a deed from Michael R. McLeod and Sally I. McLeod to Ryan Reeves and Melissa Reeves, dated August 28, 1996." Clements denies that he was aware of the 1971 water agreement at the time he purchased the well property. He obviously admits, however, that he was aware of the 1996 water agreement and that he was required to provide water to McLeod pursuant to that agreement. Clements also asserts that McLeod has failed to reimburse him for payments for electricity and maintenance as required by the 1996 water agreement.

McLeod filed suit alleging that Clements has willfully refused to supply water pursuant to the 1971 water agreement. Clements answered and counterclaimed for a declaratory judgment ordering that he be relieved from the obligation of providing water service to McLeod or, in the alternative, that Clements and his successors in

---

[2] Mrs. H. E. McLeod, Sr., is now deceased.

4

interest be permanently relieved from paying all of McLeod's maintenance and electrical costs associated with McLeod's use of the well. Clements moved for summary judgment on his declaratory claims. He argued that the 1971 water agreement is not enforceable against him because it was not recorded within his chain of title and that the 1996 water agreement is not enforceable against him because Mrs. H. E. McLeod is deceased and therefore no longer occupies the house benefitting from the agreement and because McLeod has failed to reimburse him for electricity and maintenance of the well pursuant to the 1996 water agreement. McLeod moved for partial summary judgment on Clements's obligation to provide water pursuant to the 1971 water agreement. McLeod further argued that the 1996 agreement is not binding on him because it conflicts with the 1971 agreement and because he never agreed to the cost provisions contained therein. On September 7, 2012, following an earlier hearing, the trial court granted partial summary judgment in favor of Clements on the 1971 water agreement but denied Clements's motion for summary judgment on the 1996 water agreement.[3] McLeod appeals. Clements has not cross appealed.

[3] Because the court issued its decision prior to January 1, 2013, the new rules of evidence were not in effect. See Ga. L. 2011 p. 99, § 101 (The provisions of Georgia's new Evidence Code apply "to any motion made or hearing or trial commenced on or after [January 1, 2013.]"). Accordingly, this opinion is based on the applicable rules of evidence in effect at the time of the hearing below.

1. McLeod first contends the trial court erred by refusing to issue written findings of fact and conclusions of law in response to McLeod's request to do so in compliance with OCGA § 9-11-52. But OCGA § 9-11-52 (b) plainly states that this Code section does not apply to motions except as provided in OCGA § 9–11–41 (b), which relates to involuntary dismissals and is not applicable here; thus, it does not apply to motions for summary judgment. See *Kuruvila v. Mulcahy*, 264 Ga. App. 626 (1) (591 SE2d 491) (2003) ("Findings of fact and conclusions of law. . . are not required when motions for summary judgment are ruled upon, and so the trial court did not err in omitting them.") (citations, punctuation and footnotes omitted); *Karsman v. Portman*, 173 Ga. App. 108, 109 (3) (325 SE2d 608) (1984) ("[T]he judgment entered in this case is the grant of a motion for summary judgment and is expressly excluded from the operation of OCGA § 9-11-52 by the clear language of the section.") (citation omitted).

2. McLeod primarily contends the trial court erred as a matter of law by concluding that Clements is not bound by the 1971 water agreement and, specifically, by its requirement that Clements provide water free from all cost. McLeod is incorrect. As shown below, even for a covenant running with the land, a bona fide

6

purchaser for value is not bound by such a covenant recorded outside of his chain of title unless he has either actual or constructive notice of the covenant.

"A bona fide purchaser for value is protected against outstanding interests in land of which the purchaser has no notice." (Citations omitted.) *Farris v. Nationsbanc Mtg. Corp.*, 268 Ga. 769, 771 (2) (493 SE2d 143) (1997) (unrecorded deed not enforceable against bona fide purchaser without notice of deed); *Brock v. Yale Mgt. Corp.*, 287 Ga. 849, 852 (2) (700 SE2d 583) (2010) (quoting rule as stated in *Farris*). See also OCGA § 44-2-1 ("a prior unrecorded deed loses its priority over a subsequent recorded deed from the same vendor when the purchaser takes such deed without notice of the existence of the prior deed"); OCGA § 23-1-19 ("If one with notice sells to one without notice, the latter shall be protected."). Compare OCGA § 23-1-16 ("He who takes with notice of an equity takes subject to that equity."); *Timberstone Homeowner's Assoc. v. Summerlin*, 266 Ga. 322, 323 (467 SE2d 330) (1996) (restrictive covenant enforceable against a purchaser with notice). "Indeed, there is a presumption of good faith which attaches to a purchaser for value and which remains until overcome by proof." (Citation and punctuation omitted.) *Montgomery v. Barrow*, 286 Ga. 896, 897 (1) (692 SE2d 351) (2010). Covenants that run with the land fall within the law set forth above and, accordingly, are enforceable against only those

7

with actual or constructive notice. *Hopkins v. Virginia Highland Assoc., L.P.*, 247 Ga. App. 243, 245-246 (1) (541 SE2d 386) (2000) (recorded but mis-indexed easement running with the land effective against subsequent purchasers only if purchaser "took with notice of the agreement") (citations and punctuation omitted).[4]

---

[4] As the Supreme Court of Georgia explained over 90 years ago, covenants that run with the land, as well as restrictive agreements concerning land or its use that do not run with the land, are enforceable only with notice:

> There is a growing tendency to incorporate equitable doctrines with common-law rules, and, in equity, covenants relating to land, or its mode of use or enjoyment, are frequently enforced against subsequent grantees with notice, whether named in the instrument or not, and though there is no privity of estate. It is immaterial in such cases whether the covenant runs with the land or not, the general rule being that it will be enforced according to the intention of the parties. It is only necessary that the covenant concern the land or its use, and that the subsequent grantee has notice of it. Covenants are so enforced on the principle of preventing a party having knowledge of the just rights of another from defeating such rights.

(Citation omitted.) *Rosen v. Wolff*, 152 Ga. 578, 585-586 (2) (110 SE 877) (1922). See also *Lowry v. Norris Lake Shores Dev. Corp.*, 231 Ga. 549, 551 (203 SE2d 171) (1974) (quoting *Rosen*); *Hayes v. Lakeside Village Owners Assoc.*, 282 Ga. App. 866, 867 (1) (640 SE2d 373) (2006) (same).

In the face of the well-developed law set forth above, we decline to follow *Wardlaw v. Southern Railway, Co.*, 199 Ga. 97, 98 (1) (33 SE2d 304) (1945), for its statement that covenants running with the land bind subsequent owners thereof "with or without notice."[5] Moreover, as noted by a federal court, *Wardlaw*

> has been questioned . . . by certain authorities, as it is based on a questionable distinction between negative covenants running with the land and restrictive agreements. 2 G. Pindar, *Georgia Real Estate Law and Procedure* Section 22-10, at 403 (3d ed. 1986). [And,] *Wardlaw* cites *Rosen v. Wolff,* supra, 152 Ga. 578, 110 SE 877, as authority for this rule, but in *Rosen* the party against whom enforcement of the covenant was sought, was chargeable with inquiry notice of his lessor's rights in the property subleased to him. *See Rosen*, 152 Ga. at 586[, 110 SE 877].

*In re Jenkins*, 74 B.R. 440, 448, n. 1 (Bankr. N.D. Ga. 1987).

Here, Clements has sworn that when he purchased the well property, he had no actual notice of the 1971 water agreement. And although the well and pipes were plainly apparent when he purchased his property, their existence was completely consistent with the 1996 water agreement of which Clements admits knowledge.

---

[5] *Wardlaw* has only been cited for this statement twice, in dicta in *Ricketson v. Bankers First Savings Bank, FSB*, 233 Ga. App. 11, 12-13 (1) (503 SE2d 297) (1998), and *O'Neil v. Myers*, 148 Ga. App. 749, 750 (2) (252 SE2d 638) (1979).

9

McLeod's remaining argument is that Clements had constructive knowledge of the 1971 agreement because it was recorded in 1996, years before he purchased the well property. This argument fails because the 1971 agreement was recorded outside Clements's chain of title, and a purchaser of land is only charged with constructive notice of the contents of instruments recorded within the purchaser's chain of title. *Virginia Highland Civic Assoc. v. Paces Properties*, 250 Ga. App. 72, 74 (550 SE2d 128) (2001); 3 Daniel F. Hinkel, Pindar's Georgia Real Estate Law and Procedure § 26-5, at 40-41 (6th ed.) ("Once the chain has been put together, it is then necessary to ["]grantor["] or "check out" each name *in the chain* to find any adverse instruments such as mortgages, liens, judgments, and sell-offs.") (emphasis supplied); Revised State Bar of Georgia Title Standards, § 2.3 ("In examining a title, the examiner is required to search only for properly indexed and recorded instruments *in the chain of title*.") (emphasis supplied). See also OCGA § 44-2-1 ("a prior unrecorded deed loses its priority over a subsequent recorded deed from the same vendor when the purchaser takes such deed without notice of the existence of the prior deed"). Finally, as explained in the State Bar Title Standards,

> [T]he following instrument is outside the chain of title: (A) An
> instrument from a person in the chain of title filed for record after the

10

date of filing for record of another instrument from the same person
purported to part with the same interest.

Revised State Bar of Georgia Title Standards, § 2.3.[6]

Here, although the 1971 water agreement that bound McLeod, Jr., was recorded in 1996, McLeod, Jr., transferred his property in 1992 to Michael McLeod, who, in turn, transferred the property again in 1996 without mentioning the 1971 agreement; and McLeod admits that both transfers occurred before the 1971 water agreement was recorded. Accordingly, even if the 1971 water agreement is considered a covenant running with the well property, there is no evidence in the record that Clements had actual or constructive knowledge of that agreement at the time he purchased the

---

[6] McLeod misinterprets the following quotation from *VATACS Group v. HomeSide Lending*, 276 Ga. App. 386, 391 (2) (623 SE2d 534) (2005) *aff'd,* 281 Ga. 50 (635 SE2d 758) (2006): "Chain of title includes all recorded instruments pertaining to the property that are executed by an entity holding a recorded interest in the property at the time of the execution of the instrument." (footnote omitted). McLeod contends the quotation means that so long as a person is the record title holder of the relevant property at the time that he enters into a related restrictive covenant, that covenant is considered a part of the chain of title even if the covenant is recorded after the title holder no longer holds title to the relevant property. That McLeod misreads *VATACS* is clear because the relevant issue in that case turned on the fact that the title holder both executed *and recorded* a subordination agreement during the time that it held title to the relevant property. Id. at 391-392 (2).

11

property. The trial court therefore correctly held that the 1971 water agreement cannot be enforced against Clements.

McLeod's argument that the grantor deed index entry for the 1971 water agreement was on the same page as the entry for the Michael McLeod/Reeves transfer and thereby should have given Clements notice is not supported by admissible evidence. The document was filed in the case subsequent to the grant of summary judgment and therefore was not before the trial court at the time of its decision. Similarly, McLeod's arguments based on the affidavit of Michael McLeod are without merit because that document was not before the trial court at the time of its decision. McLeod's argument that his long-standing use of the well, pipes, and water creates a quasi-easement in accordance with the terms of the 1971 water agreement is not well-founded given that the apparent pipes and well were consistent with the 1996 water agreement found in Clements's chain of title and that knowledge of an existing use of the property is necessary to support such a claim. Cf. *Merlino v. City of Atlanta*, 283 Ga. 186, 188 (1) (657 SE2d 859) (2008) ("[A] bona fide purchaser without knowledge or constructive notice of the existence of [a hidden storm-water] easement takes title free from the easement, and he may assume that there is no easement except

12

as shown of record or by open and visible indications on the land itself.") (citations and punctuation omitted).

3. Finally, McLeod contends the trial court erred because its order imposes on him new financial obligations in that the 1996 water agreement requires him to pay "a reasonable monthly fee for electricity and any well maintenance cost that are necessary to maintain the well in operating condition." This issue, however, is not before us. The trial court did not rule on the enforceability of the 1996 water agreement; it only ruled that Clements was not bound by the 1971 agreement. McLeod remains at liberty to argue that the 1996 agreement is not in effect and to seek a remedy based on equitable principles alone.

*Judgment affirmed. Phipps, C. J., and Ellington, P. J., concur*.